**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BRIAN BAYER,

          Plaintiff,

v.

OWENS-BROCKWAY GLASS
CONTAINER INC.,

          Defendant.

No. 21-cv-02864
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brian Bayer (Bayer), worked for Defendant Owens-Brockway Glass Container Inc. (Owens-Brockway), a manufacturer of glass containers and packaging for beer, wine, spirits, food, and non-alcoholic beverages. Owens-Brockway terminated Bayer's employment after he allegedly violated a safety policy. Bayer, in turn, sued Owens-Brockway alleging Owens-Brockway violated the Age Discrimination in Employment Act (ADEA) 29 U.S.C. § 623(a)(1) and Illinois Human Rights Act (IHRA), 775 ILCS 5/1-102(A); 775 ILCS 5/1-103(A), when it terminated his employment. R.[1] 1-1, Compl.[2]

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

[2]This matter was originally filed in Illinois state court and removed by Owens-Brockway pursuant to 28 U.S.C. §§ 1441 and 1446. R. 1, Notice of Removal. The Court has jurisdiction over Bayer's ADEA claim arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his state law IHRA claim pursuant to 28 U.S.C. § 1367(a).

Before the Court is Owens-Brockway's motion for summary judgment (Motion) pursuant to Federal Rule of Civil Procedure 56. R. 31, Mot. Summ. J. For the reasons stated below, the Court grants Owens-Brockway's Motion.[3]

## Background

### I.     Local Rule 56.1 Statements and Responses

Before considering the merits of the Motion, the Court first addresses Bayer's alleged failure to comply with the Northern District of Illinois' local rules relating to the statement of facts. The Court then turns to Owens-Brockway's objections to certain of Bayer's statement of additional facts.

Local Rule 56.1 governs summary judgment briefing in the Northern District of Illinois. When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acq. Co., LLC v. AIP Products Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1)). The L.R. 56.1 Statement must cite to specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368

---

[3]Citations to the parties' briefs are identified as follows: "Mot. Summ. J." for Owens-Brockway's Motion for Summary Judgment; "Memo. Summ. J." for Owens-Brockway's Memorandum of Law in support of its Motion for Summary Judgment (R. 32); "DSOF" for Owens-Brockway's Local Rule 56.1 Statement of Undisputed Facts (R. 33); "PSOAF" for Bayer's Local Rule 56.1 Statement of Additional Facts (R. 35); "Resp." for Bayer's Response to Defendants' Motion for Summary Judgment (R. 37); "Resp. PSOAF" for Owens-Brockway's Response to Bayer's Statement of Additional Facts (R. 38); "Reply" for Owens-Brockway's Reply in support of its Motion for Summary Judgment (R. 39).

F.3d 809, 818 (7th Cir. 2004)). Under Local Rule 56.1(b) and (e), the nonmovant must counter with a response to the separate statement of facts, and either admit each fact, or, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.*; *see Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."). If the non-moving party asserts additional facts not included in the moving party's statement of facts, the non-moving party is to file a statement of additional material facts "that attaches any cited evidentiary material not attached to the [moving party's statement of facts] or the non-moving party's response [thereto]." N.D. Ill. Local R. 56.1(b)(3). The Seventh Circuit has repeated that "a district court may strictly, but reasonably, enforce local rules." *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021).

Owens-Brockway argues that Bayer violated the Local Rules by failing to file any response to its statement of facts. Reply at 1–2. Specifically, although Bayer filed his statement of additional facts pursuant to Local Rule 56.1(b)(3), he did not file any response to Owens-Brockway's statement of facts pursuant to Local Rule 56.1(b)(2).

Reply at 2. Therefore, Owens-Brockway asks the Court to deem all of the facts submitted in its statement of facts admitted. *Id.*

Here, Bayer has completely and unjustifiably failed to respond to Owens-Brockway's statement of facts at all, despite the mandate that the nonmovant must either admit each fact, or dispute each fact by citing to evidence converting the fact, and explaining how it controverts the asserted fact. N.D. Ill. Local R. 56.1(e)(3). Therefore, the Court deems all facts submitted by Owens-Brockway in its statement of facts as admitted. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (reasoning that "[w]e have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission" and affirming district court's decision to deem defendant's statement of facts admitted where plaintiff failed to respond); *see also Schulz v. Serfilco, Ltd.,* 965 F.2d 516, 519 (7th Cir. 1992) (upholding district court's decision to deem admitted defendant's statement of fact where plaintiff failed to specifically respond, although plaintiff disputed facts in briefing).

Owens-Brockway also contends that Bayer includes several statements of additional fact which lack evidentiary support. *See* Resp. PSOAF ¶¶ 7, 8. Specifically, in PSOAF ¶ 7, Bayer contends that "everybody worked on everything," yet Owens-Brockway notes that none of the deposition testimony cited supports this purported statement, as it only pertains to support that Bayer, Matt Snyder, and Nate Harris were electro mechanics. *Id.* ¶ 7. Upon review of the cited-to material, the Court agrees with Owens-Brockway. *Id.* As such, the Court will not consider this portion of the statement of fact. For PSOAF ¶ 8, Bayer includes in his statement of fact that "some

machines could only be worked on when they were live." Again, Owens-Brockway contends this is not supported by the cited-to evidentiary material. *Id.* PSOAF ¶ 8. Upon review of the cited-to evidentiary material, the Court agrees, as the deposition testimony does not address whether some machines could only be worked on when they were "live." *Id.* Accordingly, the Court will also not consider this portion of PSOAF ¶ 8, either, as it is unsupported by the record citation.

The Court now turns to the material facts in the case, subject to the foregoing rulings, as it relates to the challenged claims. To the extent that Owens-Brockway disputes a statement of additional fact from Bayer, the Court considers that dispute in the Material Facts Section II, *infra*, as applicable.

## II.    Material Facts

The following facts are set forth favorably to Bayer, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Bayer's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up)[4]; *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence.

### A.    Background

Owens-Brockway manufactures glass containers and packaging for beer, wine, spirits, food, and non-alcoholic beverages at its manufacturing facility in Streator, Illinois. DSOF ¶ 1. *Id.* Bayer was an employee at the Streator facility and worked as a shift maintenance crew leader. *Id.* ¶ 2. Bayer was an hourly employee at Owens-Brockway and was represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Works International Unit, Local 140M (Local 140M). *Id.* ¶ 8.

### B.    Owens-Brockway's Policies

Owens-Brockway has a non-discrimination and non-harassment policy. DSOF ¶ 6. Its policy includes non-discrimination and non-harassment based on age and other protected characteristics, and Owens-Brockway holds itself out as an equal employment opportunity employer. *Id.* Similarly, Owens-Brockway has a "Global Code of Business Conduct and Ethics" which prohibits any form of employment discrimination based on protected characteristics, including age. *Id.* ¶ 7.

Bayer's employment was governed by an operative collective bargaining agreement (CBA), which also included that Owens-Brockway and Local 140M would "comply with all laws preventing discrimination against any employee because of . . . age[.]" DSOF ¶ 8. The CBA includes a section on termination for cause: "The right of

the Company to hire and to discipline/discharge for just cause is hereby acknowledged." *Id.* ¶ 9.

Owens-Brockway had a "Lock Out/Tag Out Plant Safety Procedure" in effect in 2019. DSOF ¶ 10. The Lock Out/Tag Out policy provides that when working as a crew, each authorized employee was to affix their personal lockout device to the multiple lockout device, lockbox, or comparable mechanism, and that energy isolation was to be accomplished using both "locks and tags jointly, whenever possible." Resp. PSOAF ¶¶ 9–10. Further, at the Streator facility, Plant Rule 10 in effect in 2019 provided: "An employee must comply with all safety rules, and must wear safety articles and use protective equipment provided to him/her for use in designated areas at all times." DSOF ¶ 11. The Plant Rules are "designed to insure the safety and security of all plant employees. The following shop rules are in effect and employees violating these shall be liable to disciplinary action, including possible termination." *See id.*; R. 33-1, Exh. A-5, Plant Rules.

### C. Bayer's Employment

Bayer was originally hired by Owens-Brockway as an apprentice mechanic in 2005. DSOF ¶ 12. After his hire, Bayer took classes at Illinois Valley Community College, which included Basic Industrial Electricity I and II, and Motors and Controls I and II. *Id.* ¶ 13. Within the first year of his hire, Bayer attended maintenance safety training through Owens-Brockway, including training on lockout/tagout procedures at the facility. *Id.* ¶ 14.

Following his apprenticeship with Owens-Brockway, Bayer became a "journeyman electrical mechanic" in 2008. DSOF ¶ 15. In either 2015 or 2016, Bayer became the maintenance crew leader for his shift, and in that capacity acted as the "main electrician." *Id.* ¶ 16. Bayer earned an extra $20 per week in pay when he became the maintenance crew leader, and was making approximately $31 per hour at the time of his termination. PSOAF ¶¶ 3–4. During his shift, Bayer was the most senior electrician. DSOF ¶ 17. As the maintenance crew leader during his shift, his responsibilities included repairing machines, troubleshooting, and resolving electrical issues at the facility. *Id.* Bayer was the only electrician during his shift, and he was the contact for electrical issues. *Id.* Bayer did not have supervisory responsibility over other employees as a maintenance crew leader, or direct the actions of others. PSOAF ¶ 5. It is undisputed that other employees including Nate Harris, Matt Snyder, Stephanie Underwood, and Kevin Chalky also had responsibility to troubleshoot and resolve electrical issues at the plant, in addition to Bayer, and that each employee worked on electrical issues utilizing specialized knowledge to do so. Resp. PSOAF ¶ 6.

## 1. Disciplinary History

Owens-Brockway includes the details of Bayer's disciplinary history in its Motion. Specifically, Bayer received the following discipline during his employment with Owens-Brockway:

- Coaching and counseling for "not doing the second set of rounds in the power house" in 2012 (DSOF ¶ 23);

8

- Coaching and counseling for not reporting to a call timely in 2013 (*id.* ¶ 24);

- Verbal warning for failing to recognize a short in a wire going into a machine in 2013 (*id.* ¶ 25);

- Verbal warning for telling his supervisor "it's not my job" to call his co-workers when asked (*id.* ¶¶ 26–27);

- Verbal warning for inadequate work performance in 2013 (*id.* ¶ 29);

- Written warning for inadequate work performance in 2017 (*id.* ¶ 30);

- Written warning for failing to properly troubleshoot a machine and requiring supervision to fix the problem in 2018 (*id.* ¶ 32); and

- Coaching and counseling for inadequate work performance in 2018 (*id.* ¶ 33).

None of the disciplinary actions purport to be for safety violations. *See id.*

### 2.  Safety Training

Following his verbal warning in 2013, Owens-Brockway enrolled Bayer in courses at Illinois Valley Community College to help improve his ability to troubleshoot and provide satisfactory electrical services and maintenance, and he took Motors and Controls I (a course he also took in 2006 during his apprenticeship), and which again covered the lockout/tagout process. DSOF ¶ 28.

Bayer testified that he would have taken a lockout/tagout class the first day of his employment with Owens-Brockway. PSOAF ¶ 1. Bayer had a personal lock provided to him by Owens-Brockway that he kept on him, and during the training he received at Owens-Brockway and during a course at Illinois Valley Community College, he was instructed to use that lock to lock and tagout a machine prior to working on the machine. DSOF ¶ 34. In October 2018, Bayer attended additional

electrical safety training, and in May 2019 he had additional lockout/tagout safety training by Owens-Brockway. *Id.* ¶ 35. Bayer testified that in all of his training from Owens-Brockway he was never told that he should work on a machine while it was live and without locking it out. *Id.* ¶ 49.

### D. Harris and Snyder's Employment

Owens-Brockway employees Nate Harris and Matt Snyder were both maintenance mechanics, or "electro mechanics," that worked on Bayer's shift, however, they were not electricians. DSOF ¶ 19; PSOAF ¶ 7. Harris completed his apprenticeship on October 14, 2019, and Snyder completed his apprenticeship on February 18, 2019. DSOF ¶ 22. Although Bayer was qualified to work on high voltage machinery through his onsite training in 2013, Harris and Snyder were only qualified to work on machinery up to 110 volts. *Id.* ¶¶ 20–21.

### E. Incident on November 30, 2019 – December 1, 2019

Bayer was the maintenance crew leader on the midnight shift, beginning at 10:30 p.m. on November 30, 2019 and ending at 6:30 a.m. on December 1, 2019. DSOF ¶ 37. During the shift, at approximately 2:00 a.m., he was called to the I2 production line which makes glass bottles, and where a part of the machine, the AP5 hood, had malfunctioned. *Id.* ¶ 38. Bayer testified that the fuse holder within the fuse panel on the AP5 hood needed to be replaced. *Id.* ¶ 39. Bayer stated he was called to work on the machine because he was the shift electrician, and the person who had originally opened the fuse panel was not certified to do electrical work on a machine with 480 volts. *Id.*

Donna Williams was a Team Leader employed by Owens-Brockway during the shift. Resp. PSOAF ¶ 13. On the shift in question, Bayer testified that he and his coworkers looked for a knife switch for the AP5 hood but were unable to find it. DSOF ¶ 40. The only way to ensure the machine was powered down was to lock it out on the knife switch. *Id.* ¶ 41. A number of employees including Kevin Chalky, Stephanie Underwood, Williams, Bayer, Snyder, and Harris spent approximately 15 to 20 minutes searching for the knife switch to shut off power to the AP5 hood before Bayer began working on the fuse holder. Resp. PSOAF ¶ 11. It is also undisputed that Bayer, Harris, and Williams attempted to contact Dave Carter, Greg Cole, Joshua Lange, Tommy Nagle, and Chad Sweeten for assistance, but were unable to reach them. Resp. PSOAF ¶ 12. Bayer and his coworkers started working on the machine while it was "live" at approximately 4:00 a.m. DSOF ¶¶ 42–43; PSOAF ¶ 15. It is undisputed that journeyman mechanics are expected to resolve electrical and mechanical problems. Resp. PSOAF ¶ 2. As they worked on the machinery, Bayer, Harris, and Snyder pulled the old fuse holder out of the fuse box and replaced it with a new fuse holder, with Bayer holding a wire with needle nose pliers, while Harris was running a screwdriver, and Snyder was holding a flashlight. DSOF ¶ 43. They landed one wire, but a spark – or "arc flash" – occurred while placing another wire in the fuse box. DSOF ¶¶ 44, 46.

Bayer testified that the spark or arc flash did not come into contact with anyone, but made a popping noise that he thought could be heard throughout the facility. DSOF ¶ 45. Bayer also testified that if the arc flash came into contact with

himself, Harris, or Snyder, they "all could have been killed," which he learned during training. *Id.* ¶¶ 47–48. After the arc flash, Bayer, Snyder, and Harris walked away, and co-worker Nagle found the knife switch, and then Bayer assisted another co-worker, Carter, in repairing the machine. *Id.* ¶ 53. Bayer testified that failing to follow the lockout/tagout process was a severe safety violation. *Id.* ¶¶ 36, 50.

The parties dispute whether Williams instructed Bayer to work on the AP5 hood while the machine was still live. PSOAF ¶ 14; Resp. PSOAF ¶ 14. In support, Bayer cites to his testimony, and in rebuttal, Owens-Brockway cites to Williams' Declaration, and states that Williams' was not Bayer's supervisor. PSOAF ¶¶ 14–15; Resp. PSOAF ¶¶ 14–15. Bayer also testified that were it not for pressure from Harris, he would not have changed the fuse holder. PSOAF ¶ 16. These factual disputes are not capable of resolution at the summary judgment stage based on the competing evidence, however, the Court accepts Bayer's contention as the non-movant.

Bayer also testified that both Snyder and Harris were not qualified to work on the fuse box on the AP5 hood because they were only qualified to work on machines up to 110 volts, and the AP5 hood was 480 volts. DSOF ¶ 51. It is unrebutted that Bayer was more senior, with more electrical experience, than either Snyder or Harris. *Id.* ¶ 52.

It is undisputed that Bayer had previously worked on machines at the plant without locking them, and that he was disciplined in May 2018 for failing to properly troubleshoot a machine he was working on without locking and tagging it out. Resp. PSOAF ¶ 8.

### F.    Suspension and Termination

Following the incident Bayer was suspended pending discharge on December 3, 2019, and then later terminated. DSOF ¶ 54; PSOAF ¶ 19. In his notice of suspension, Bayer was suspended for violating Plant Rule 10. DSOF ¶ 55. However, he disagreed that he violated Plant Rule 10. *Id.* Bayer was offered an opportunity for a different position in the facility's selection department as part of a last-chance agreement, but he rejected that offer. *Id.* ¶ 56. Bayer said that role was to make approximately $19 per hour. Resp. PSOAF ¶ 17.

Snyder and Harris were both suspended pending discharge on December 11, 2019 for violating Plant Rule 10, and were brought back to their positions as maintenance mechanics on last chance agreements. DSOF ¶ 59; Resp. PSOAF ¶ 20. In their last chance agreements, it was indicated that Snyder and Harris would "return to work under a twelve (12) month probationary period" and that "[f]ailure to make improvement or recurrence of inappropriate behavior or conduct within the specified time period as described in the twelve (12) month probationary period will result in immediate termination." DSOF ¶ 60.

During a termination meeting, Bayer was informed that he was being terminated for failing to follow the lockout/tagout procedure during the arc flash incident. DSOF ¶ 57. At the time, he was 52 years old. *Id.* ¶ 58.

The decisionmaker for the suspensions of Bayer, Harris, and Snyder was Senior Plant Manager Ron Warnecke, who also made the decision to terminate Bayer. DSOF ¶ 61. Warnecke's stated reason for suspending and terminating Bayer was

because he was the electrician on the shift, and that he violated Plant Rule 10 by failing to follow lockout/tagout procedures which caused the arc flash. *Id.* ¶ 62. Warnecke's stated reason for suspending Snyder and Harris, and allowing them to return on last-chance agreements after suspension, was because they only recently completed their apprenticeships, did not have an extensive history of discipline, and were not electricians. *Id.* ¶ 63. Bayer testified he only met Warnecke on Warnecke's first day, and never saw him after his first day at the plant. *Id.* ¶ 64. Warnecke did not know the ages of Bayer, Snyder, or Harris at the time of Bayer's termination. *Id.* ¶ 66.

### G.    Age-Related Comment

In briefing the Motion, Bayer submits that within the year prior to his termination, the Assistant Plant Manager, Joshua Lange, referred to Bayer as "old balls" as he and Bayer climbed a set of stairs. PSOAF ¶ 18. Bayer maintains that he reported this comment to his supervisor, Greg Cole, the Head Plant Engineer, who did not respond. *Id.* Owens-Brockway disputes this factual assertion with a Declaration from Lange, who denies making the comment, and Cole, who denies receiving such a complaint from Bayer. Resp. PSOAF ¶ 18. Again, based on the statements of the witnesses, this factual dispute is not capable of resolution at the summary judgment stage, however, the Court accepts Bayer's contention as the non-movant.

14

### H. Administrative Remedies

Following his termination, Bayer filed a charge of discrimination with the Illinois Department of Human Rights (IDHR) against Owens-Brockway. DSOF ¶ 67. In his charge, he alleged that Owens-Brockway discriminated against him based on his age. *Id.* The IDHR issue a notice of dismissal, stating: "A finding of lack of substantial evidence is recommended because . . . [t]he evidence shows that Complainant was discharged for violating Respondent's safety rules, which is consistent with Respondent's policies." *Id.* ¶ 68.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci.,*

15

*Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (cleaned up). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

Bayer alleges that Owens-Brockway discriminated against him based on his age when it terminated his employment in violation of the ADEA and IHRA. At the time of termination, he was 52 years old.

The ADEA and IHRA make it unlawful for an employer to take adverse employment action against an individual because of the individual's age. 29 U.S.C. § 623(a)(1); 775 ILCS 5/2-102. "The ADEA protects workers 40 years of age and older from age-based employment discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y.*, 911 F.3d 450, 454 (7th Cir. 2018) (cleaned up); *see also* 29 U.S.C. § 631(a). The Court uses the same analytical framework for claims made under the IHRA and ADEA. *Filipek v. Oakton Community College*, 312 F. Supp. 3d 693, 700 (N.D. Ill. 2018), *aff'd sub nom. Dayton v. Oakton Community College*, 907 F.3d 460 (7th Cir. 2018) (citing *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F. 3d 654, 659 (7th Cir. 2013)). "At summary judgment, plaintiff must produce evidence from which a jury could infer

that his age was a but-for cause of his termination." *Rivera v. WestRock Services Inc.*, 2018 WL 6528017, at *3 (N.D. Ill. Dec. 12, 2018) (cleaned up).

A plaintiff can prove an ADEA claim under either the direct or indirect method of proof. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014). In recent years, however, the Seventh Circuit has moved away from—while not abandoning completely—these two methods, instead instructing that, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The ultimate question, then, is whether there is evidence that "would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Id.*; *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (assessing the evidence in an ADEA claim "as a whole, rather than asking whether any particular piece of evidence proves the case by itself.") (quoting *Ortiz*, 834 F. 3d at 765)).

Here, both parties utilize the *McDonnell Douglas* framework within their briefs. For this reason, the Court analyzes Bayer's claims using the familiar burden-shifting *McDonnell Douglas* framework, before turning to a cumulative review of the evidence to decide whether a factfinder could determine that Bayer's age caused his termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Rooney v. Koch Air, LLC*, 410 F.3d 376, 380 (7th Cir. 2005). Under the *McDonnell Douglas* framework, to establish a prima facie case of age discrimination, Bayer must show

17

that: (1) he was over forty years of age; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002).

If Bayer meets that burden, then Owens-Brockway must "set forth a legitimate nondiscriminatory reason for the adverse employment action which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment actions." *Nichols v. Southern Illinois University-Edwardsville*, 510 F. 3d 772, 783 (7th Cir. 2007). "If the employer satisfies its burden, the burden shifts back to the plaintiff to prove that the proffered reason was pretextual." *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001). Pretext is defined as "a dishonest explanation, a lie, rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675–676 (7th Cir. 2003).

It is undisputed that Bayer—who was 52 years old when he was fired—was protected from discrimination under the ADEA and IHRA. Owens-Brockway argues that Bayer's age discrimination claims fail because Bayer (1) was not meeting Owens-Brockway's legitimate expectations when he was terminated; (2) has not adduced evidence that Owens-Brockway treated similarly situated employees who were not members of his protected class more favorably; and (3) cannot establish the reason

for his termination was pretextual. Memo. Summ. J. at 8–15. Owens-Brockway also contends that when considering the evidence as a whole, pursuant to *Ortiz*, Bayer fails to establish that he was discriminated against based on his age. *Id.* at 8.

The Court addresses each argument below.

## I. Whether Bayer Has Established a Prima Facie Case of Age Discrimination

To establish a prima facie case of age discrimination, Bayer must show: (1) he is a member of a protected class, (2) he was meeting Owens-Brockway's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). It is undisputed that Bayer was a member of a protected class based upon his age at the time of his termination, and that he suffered an adverse employment action when Owens-Brockway terminated his employment. Resp. at 6–7. That leaves elements (2) and (4) at issue, which the Court addresses below.

### A. Legitimate Performance Expectations

Owens-Brockway argues that Bayer was not meeting its legitimate performance expectations given his serious safety violation during the shift beginning on November 30, 2019, which could have led to serious injury or death. Memo. Summ. J. at 8. Specifically, Bayer violated the Lock Out/Tag Out Plant Safety Procedure and Plant Rule 10 which required Bayer to shut down equipment before working on the equipment. *Id.* Owens-Brockway highlights Bayer's admissions in his deposition that failing to follow the proper procedures were both a "severe" and "serious" safety

violation. *Id.* As for his role in the incident, Owens-Brockway argues that Bayer was the only electrician on shift, and was the only employee working on the AP5 that was qualified to work on the machinery given its high voltage. *Id.* at 9. This is the but-for reason, contends Owens-Brockway, for Bayer's termination, citing in support *McDaniel*, 940 F. 3d at 370, *Rivera*, 2018 WL 6528017 at *7, and *Garcia v. AT&T Corp.*, 2022 WL 2527996, at *5 (N.D. Ill. July 6, 2022), dismissed, 2023 WL 1765233 (7th Cir. Jan. 23, 2023).

Owens-Brockway also contends that Bayer's long history of discipline for inadequate work performance between 2012–2018 also supports that he was not meeting its legitimate performance expectations at the time of his termination, either. *Id.* at 8–10.

In response Bayer posits that the element of meeting legitimate performance expectations can be met by a plaintiff asserting his job performance is satisfactory. Resp. at 5–6 (citing *Oates v. Discovery Zone*, 116 F. 3d 1161, 1171 (7th Cir. 1997). Bayer also points out that he had previously performed work on machines that were live in violation of the lockout/tagout procedures, and the only difference between those instances and the one on December 1, 2019 was the arc flash. Resp. at 7. In defense of his actions, Bayer explains that he only agreed to work on the AP5 hood without locking it out because he was ordered to do so by the Team Leader, Williams, and pressured by Harris. *Id.* at 7–8. Bayer also points to prior incidents where he alleges that his supervisor knew Bayer worked on a machine that had not been locked out. *Id.* at 8. Bayer insists that, "[t]he lockout/tagout violation which led to his

termination had no precedent whatsoever in his disciplinary history, which had previously consisted primarily of performance or interpersonal issues unconnected with safety." *Id.* at 10.

Bayer argues that cases cited by Owens-Brockway are distinguishable. Resp. at 8. *McDaniel* is distinguishable asserts Bayer because the court did not reach the issue of legitimate performance expectations, finding instead that plaintiff failed to meet the fourth element of the prima facie case. *Id.* As for *Rivera*, Bayer contends that case is distinguishable because the plaintiff's responsibilities included safety training for other employees, and the plaintiff in that case had been disciplined for the same safety violation issue in the past, unlike Bayer. *Id.* at 8–9. Finally, Bayer argues *Garcia* is also distinguishable because the plaintiff in that case had a disciplinary history which included repeated safety violations, unlike his disciplinary history which included no safety violations. *Id.* at 9.

Bayer also posits that he received no disciplinary actions during the year prior to the events on December 1, 2019. Resp. at 7. Further, he explains that the majority of the disciplinary actions he did receive occurred before 2015 and 2016 when he was given recognition as the maintenance crew leader, and the only disciplinary actions after that time did not involve any safety violation. *Id.*

The Court begins with Owens-Brockway's secondary argument first, that Bayer's disciplinary history supports that he was not meeting its legitimate performance expectations at the time his employment was terminated.

21

The Court finds that Bayer's disciplinary history is not evidence of his failure to meet Owens-Brockway legitimate performance expectations at the time of termination of his employment. Warnecke, the decisionmaker, decided to terminate Bayer's employment "because he was the electrician on the shift, and he violated Plant Rule 10 by failing to follow lockout/tagout procedures when working on a piece of equipment on December 1, 2019, causing an electrical arc flash." R. 33-3, Warnecke Decl. ¶ 5. Warnecke "never reviewed Brian Bayer's personnel records." *Id.* ¶ 6. Put simply, nothing in the record supports Owens-Brockway's contention that Bayer's termination was the result of a series of disciplinary actions throughout his tenure with the company, or that Bayer was subject to progressive discipline based on his disciplinary history such that this incident was a final straw.

The Court now turns to whether Bayer has established that he was meeting Owens-Brockway's legitimate performance expectations.

The undisputed evidence reveals that Bayer's involvement in the arc flash incident was a safety violation and violation of Owens-Brockway's Plant Rule 10. Bayers seeks to explain his violation by contending that he was instructed to work on the AP5 hood while it was live by Team Leader Williams. Owens-Brockway, on the other hand, asserts that Team Leader Williams denies instructing Bayer to work on the machine while it was live. R. 38-1, Williams Decl. ¶¶ 4–5. The same is true for Bayer's contention that he felt pressured by Harris to work on the machine. PSOAF ¶ 16. Viewing the evidence in the light most favorable to Bayer, it must be taken as true that Williams instructed him to work on the machine while it was live and that

22

Harris pressured Bayer to work on the machine. But the facts remain that it was a violation of Plant Rule 10 to work on the machine while it was live. Ultimately, Bayer's work on the machine was done in his capacity as an electrician, and the maintenance crew leader, and it is undisputed that he was the only one qualified to work on that equipment given its voltage. DSOF ¶¶ 20–21, 39. Why Bayer violated the safety rules is not material to his age discrimination claim, and that Bayer previously violated the safety rules without facing disciplinary repercussions does not somehow inoculate his actions and failure to meet Owens-Brockway's legitimate expectations on this occasion especially where, as Bayer concedes, the difference on this occasion was the arc flash that could have killed someone. Resp. at 7; *see, e.g.*, *Widmar v. Sun Chem. Corp.*, 2013 WL 2112133, at *7 (N.D. Ill. May 15, 2013), *aff'd*, 772 F.3d 457 (7th Cir. 2014) (finding a lack of prior complaints for employee under a different supervisor was not indicative of intentional discrimination). Further, Bayer himself admits the conduct, and that it was a serious safety violation. That Bayer believes the punishment should have been less than termination, or that Bayer believes he should be able to violate Plant Rules without repercussion, does not make Owens-Brockway's enforcement of its policies discriminatory.

Further, the Court finds Bayer's efforts to distinguish the cases cited by Owens-Brockway unavailing. For example, in *McDaniel*, contrary to Bayer's suggestion, the court did reach the question of whether plaintiff was meeting legitimate expectations (albeit in the context of analyzing age discrimination using the *Ortiz* approach), and the Seventh Circuit found that plaintiff admitted violating

certain policies, including a lifting policy, and that he "provided no evidence to raise an issue of fact that he experienced discipline as a result of his age." 940 F.3d at 370. In *Rivera*, it is true that plaintiff was terminated after two violations of a lock out policy, however, that case does not stand for the proposition that as a matter of law an employee needs to be disciplined progressively for the same violation before termination, and in that case the decisionmakers followed a practice of suspending for a first violation, and terminating for a second violation, of the applicable lock out policy. 2018 WL 6528017 at *2. Finally, in *Garcia*, the plaintiff was disciplined for violating several company policies, and on that basis the court found the plaintiff "cannot satisfy the legitimate expectations element of the *McDonnell Douglas* framework." *Garcia*, 2022 WL 2527996 at *4. Simply put, Bayer has not identified case law to support his argument that he was meeting Owens-Brockway's legitimate performance expectations at the time of his termination, especially where he admits to the serious policy violation.

### B.    Similarly Situated Employees

Even if Bayer were meeting Owens-Brockway's legitimate expectations, he has failed to present evidence of a similarly situated comparator, which also dooms his claim under the *McDonnell Douglas* framework.

Generally, for employees to be similarly situated, Bayer must show that the employees "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." *McDaniel*, 940 F.3d at 368–69 (cleaned up). "Its purpose is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* at 368 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)).

Here, the alleged comparators are Snyder and Harris. Owens-Brockway contends that neither employee is a similarly situated comparator because they held different positions, had different levels of experience, lacked electrical training, and lacked prior discipline. Memo. Summ. J. at 10. Specifically, both Snyder and Harris were "new journeyman maintenance mechanics" at the time of the incident, compared to Bayer's position as the maintenance crew leader and electrician. *Id.* at 11. Snyder and Harris had recently completed apprenticeships, versus Bayer's completion of apprenticeship in 2008, where he was journeyman for ten plus years at the time of the incident. *Id.* Owens-Brockway also highlights the fact that neither Snyder nor Harris was qualified to work on the AP5 hood based on the voltage of the machinery, whereas Bayer was so qualified. *Id.* Owens-Brockway cites to several cases standing for the proposition that years of work experience is a relevant consideration in the similarly situated analysis. *Id.* at 12. Finally, Owens-Brockway states that neither Snyder nor Harris had any disciplinary history or history of performance issues, unlike Bayer. *Id.*

In response, Bayer concedes that while he was the shift electrician, all three employees shared a supervisor, they all worked on mechanical and electrical repairs,

including similar malfunctions as Bayer, and there is no evidence that either Snyder or Harris was subject to different or lesser safety standards than Bayer. Resp. at 10. Most critically, argues Bayer, is that "all three employees violated the exact same rule in the exact same fashion at the exact same time" which evidences what Bayer considers "the clearest demonstration of the discrimination against the plaintiff[.]" *Id.* at 11. Bayer cites to *Dunleavy v. Langfelder* for the proposition that "[t]he north star in the similarly situated inquiry has always been whether the two employees engaged in conduct of comparable seriousness." 52 F.4th 349, 354 (7th Cir. 2022) (cleaned up). Here, argues Bayer, while he was terminated, Snyder and Harris were only suspended. *Id.* Bayer contends their respective disciplinary histories have little "objective relevance" under the circumstances, and although Snyder and Harris were journeyman mechanics for less time than Bayer, "there is no way that they were not equally aware of the lockout/tagout policy of the defendant." Resp. at 11–12. Finally, Bayer purports to distinguish Owens-Brockway's argument on experience and training as relevant considerations in the similarly situated analysis by arguing that employees in the cited-to cases had different levels of experience "*relevant to the alleged infractions*, a factor which makes them less meaningful comparisons to the present case." *Id.* at 12–13 (emphasis in original) (distinguishing Owens-Brockway's cases).

In reply, Owens-Brockway highlights that Snyder and Harris were merely "inexperienced maintenance mechanics assisting Bayer in working on the AP5 hood[.]" Reply at 7. Owens-Brockway also insists that Bayer has failed to point to any

evidence in the record to establish that either comparator was outside of his protected class. *Id.* No matter, argues Owens-Brockway, as the undisputed record establishes that Bayer was a journeyman since 2008, became a maintenance crew leader in either 2015 or 2016, was the main and most senior electrician on his shift, and was qualified to work on high voltage machinery, whereas Snyder and Harris had only recently completed their apprenticeships, were not electricians, and were only qualified to work on machinery up to 110 volts. *Id.* at 8. Owens-Brockway also distinguishes the work they were doing on the machinery, where Bayer was landing the wire, and where Snyder and Harris were only assisting. *Id.* Finally, Owens-Brockway cites to Warnecke's reasoning itself as evidence that the employees were not similarly situated: "I made the decision to allow Matt Snyder and Nate Harris to return to their positions on last-chance agreements after serving their suspensions because they had only recently completed their apprenticeships, they did not have an extensive history of discipline, and they were not electricians." *Id.*; citing DSOF ¶ 63 (Warnecke Decl. ¶ 6). Owens-Brockway distinguishes *Dunleavy* by arguing that the comparators in that case where hired at the same time, into the same position, with the same pay, and on the same 12-month probationary period. Reply at 10.

The Court agrees with Owens-Brockway that the comparators identified by Bayer are not similarly situated. First, and fundamentally, the Court agrees with Owens-Brockway that Bayer has failed to identify evidence in the record that either Snyder or Harris was outside of his protected class. *See generally* DSOF; PSOAF. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs,

hunting for truffles buried in briefs."). Although Bayer contends in his response that Snyder and Harris were younger than him—"Snyder and Harris, two younger employees who were not terminated from their positions after the events of December 1, 2019" and "defendant does not contest that both Harris and Snyder were under the age of 40 on December 1, 2019"—he cites to nothing in the record to support those allegations in his response brief, and the statements of fact do not include this information, either. Resp. at 10. Thus, Bayer has failed to adduce evidence to support that his alleged comparators were, in fact, outside of his protected class.

Nevertheless, even if the Court assumes both employees were outside of his protected class, Bayer has also failed to establish the criteria for the Court to make a finding they were similarly situated at the time of the incident. Under a commonsense inquiry, the Court finds these are differentiating and mitigating circumstances that distinguish the employees, such that neither Snyder nor Harris is a proper comparator. *See Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018). True, there is nothing in the record to support that Bayer directed the actions of Harris or Snyder, or had supervisory responsibility over them (or anyone else), but it is undisputed that he was the most senior, and he was the only electrician qualified to work on the equipment given the voltage out of the three employees, and he was the maintenance crew leader, a position neither Snyder nor Harris held at the time shortly after completing their apprenticeships.

Finally, the Court finds Bayer's reading of *Dunlevy* to be correct, and that the Seventh Circuit's analysis came down to whether two employees' conduct was of

"comparable seriousness." *See* 52 F.4th at 354. However, in order to make that determination, the Court finds the position of the employee and his experience to be relevant in assessing the comparable seriousness, and it is undisputed that Snyder and Harris held different positions, and had far less experience and qualifications than Bayer, and were not themselves qualified to work on the machinery given its voltage. *See* DSOF ¶¶ 15–17, 19, 20–22, 39, 51–52. It is a situation where, simply put, Bayer should have known better given his qualifications and position in comparison to the newly apprenticed mechanics.

Thus, the Court finds Bayer's claim also fails because he has not adduced evidence of similarly situated employees outside of his protected class that received better treatment. Because Bayer has not established a prima facie case of age discrimination, the Court does not reach the question of whether there was pretext.

## II.   Cumulative Assessment of the Evidence Does Not Support Bayer's Claims

Finally, the Court evaluates the evidence cumulatively to determine whether a reasonable factfinder could determine that Bayer's age caused his termination. *Rivera*, 2018 WL 6528017 at \*7. On the record before it, the Court cannot conclude that Bayer's age was the but-for cause of his termination. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010) ("To establish a violation of the ADEA, an employee must show that age actually motivated the adverse employment action.")

Here, the record is devoid of any evidence suggesting Bayer's age motivated his termination by Warnecke following the safety incident. Although Bayer attempts to downplay the distinctions between himself and Snyder and Harris, and their role

in the incident, the undisputed record confirms he was the employee with the requisite experience and qualifications to address the AP5 machinery issue, not Snyder or Harris, such that Owens-Brockway's suspending Snyder and Harris, and suspending and terminating Bayer, does not support discriminatory animus based on Bayer's age, especially where the ages of Snyder and Harris are unknown to this Court. Further, the undisputed record confirms that Warnecke did not know the ages of Bayer, or Snyder or Harris at the time he made the decision to terminate Bayer and to suspend Snyder and Harris. Further, the one age-related comment alleged by Bayer was made by Lange and reported to Cole, not Warnecke. A remark such as this alleged remark made by Lange—which the Court accepts as true on summary judgment although it is disputed by Owens-Brockway—can raise an inference of discrimination under certain conditions, however, none of those conditions are present here. Specifically, the comment was not made by the decisionmaker, was not made around the time of the termination decision, and did not in any way reference Bayer's termination. *See*, *e.g.*, *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016). In short, there is no evidence in the record that Warnecke was aware of the comment or complaint, or that it was close in time to the safety incident or Bayer's termination, or that Warnecke was in any way influenced by Lange or Cole. Moreover, Bayer has not suggested Warnecke consulted with anyone else in making the decision to terminate, or lied about or changed his reasoning for termination such that any discriminatory animus could be inferred.

Thus, considering all of the evidence in the record, the Court finds Bayer has not adduced evidence to support his age discrimination claim.

## Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [31] is granted. Civil case terminated.

Dated: March 1, 2024

United States District Judge
Franklin U. Valderrama